.B.C. ZIEGLER & COMPANY, Plaintiff-Respondent,

v.

Lawrence P. EHREN, Defendant-Appellant.

Court of Appeals

*No. 86–2322. Submitted on briefs May 26, 1987.—Decided*
*August 5, 1987.*
(Also reported in 414 N.W.2d 48.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Dennis M. Sullivan* of *Kahn & Flynn, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Charles O'Meara* of *O'Meara, Eckert, Pouros & Gonring* of West Bend.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J. Lawrence P. Ehren appeals from a grant of summary judgment restraining him from using or disclosing information contained on business papers and records he bought from a scrap paper company but which originated with B.C. Ziegler and Company (Ziegler). The circuit court held that the information was entitled to common-law trade secret protection and that Ehren did not acquire title to the information as a good-faith purchaser. We affirm those rulings.

Ziegler is an underwriter of securities located in West Bend. Ehren is employed by a scrap dealer,

Lynn's Waste Paper Co., Inc. (Lynn's), where his duties include determining the value for recycling purposes of scrap paper purchased by Lynn's. From 1981 to 1983, Ehren was a licensed securities salesman and worked for two brokerage firms which compete with Ziegler.

Ziegler considered its customer lists confidential and had developed policies for the disposal of scrap paper which were regularly communicated to its employees. Paper containing a customer name was to be burned or shredded on the Ziegler premises before disposal or was to be delivered for shredding to a commercial shredding concern in Appleton, in which case the employee delivering the paper was to wait while it was shredded. Under no circumstances was scrap paper containing names or information about Ziegler customers to leave the possession of its employees in readable form. Scrap paper not containing such information could be disposed of in unshredded form.

On several occasions in late 1985, boxes of scrap paper were delivered to Lynn's by Ziegler maintenance employees. Neither those employees nor Lynn's was aware that these batches of paper scrap contained Ziegler customer names, account summaries and other information on preaddressed envelopes bearing Ziegler's return address, a computer printout, monthly statements and other business records. Lynn's paid scrap rates for the paper. Ehren subsequently purchased from Lynn's six boxes of Ziegler materials in two transactions for a total of $16.75.[1]

---

[1]Ehren and his co-employees frequently bought scrap materials from Lynn's.

In the ensuing months, Ehren's daughter began sorting the Ziegler envelopes alphabetically and by zip code. In December of 1985, Ehren approached a former business associate, Thomas Thorson, a broker with a securities firm in competition with Ziegler, about using the names on the envelopes. There was some evidence that neither was sure of the value of the names, believing they might merely be the names of prospects rather than actual Ziegler customers. However, Ehren suggested compensation of one dollar per name.

Ehren delivered approximately 11,600 envelopes to Thorson. Thorson sent a mailing, soliciting securities sales, to some of the names and received responses at a rate of eight to ten percent, compared to a normal rate of two or three percent.

Ziegler learned that its customers were receiving solicitations and requested that the West Bend Police Department conduct a quiet investigation to determine whether customer information was being leaked from the company. After learning through the police investigation that Ehren possessed the customer information, Ziegler brought this action seeking injunctive relief and replevin. After granting Ziegler temporary relief, the circuit court granted Ziegler's motion for summary judgment, permanently enjoined Ehren from using or disclosing the information, and ordered, subject to a stay pending appeal, that the Washington County Clerk of Courts, to whose possession the materials had previously been transferred, destroy the materials. The court also dismissed on the merits Ehren's counterclaims for conspiracy, restraint of trade and tortious interference with business. This appeal followed.

Ehren first claims the circuit court erred in finding that the information contained in the Ziegler materials was a trade secret belonging to Ziegler.

Preliminarily, we address the question of whether the recently enacted Wisconsin Uniform Trade Secrets Act, sec. 134.90, Stats., governs this action. We hold that it does not apply.

■

Sections 14 and 16, 1985 Wis. Act 236 provide that the Act first applies to actual or threatened misappropriation of trade secrets occurring on the Act's effective date, April 24, 1986, or to a continuing misappropriation which begins before, on or after the effective date.[2] Ehren acquired the Ziegler materials in late 1985. On March 7, 1986, the circuit court ordered the Ziegler materials delivered to Attorneys Houseman, Feind and Castner of Grafton, and on April 15, 1986

---

[2]Misappropriation is defined in sec. 134.90, Stats., as follows:

(2) **Misappropriation.** No person, including the state, may misappropriate or threaten to misappropriate a trade secret by doing any of the following:

(a) Acquiring the trade secret of another by means which the person knows or has reason to know constitute improper means.

(b) Disclosing or using without express or implied consent a trade secret of another if the person did any of the following:

1. Used improper means to acquire knowledge of the trade secret.

2. At the time of disclosure or use, knew or had reason to know that he or she obtained knowledge of the trade secret through any of the following means:

a. Deriving it from or through a person who utilized improper means to acquire it.

b. Acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use.

c. Deriving it from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

d. Acquiring it by accident or mistake.

ordered the materials transferred to the Clerk of Courts of Washington County. While Mr. Thorson may have retained certain of the names in his firm's computer memory, he is not a party to this action. Ziegler has not contended that Ehren himself continued to acquire, derive, use or disclose the information after the materials were transferred to the Grafton attorneys and, later, to the clerk of courts. We conclude that the mere fact that Ehren continued to assert ownership after that time does not establish a threatened or continuing misappropriation. Therefore, sec. 134.90, Stats., does not apply.

Thus, we look to the common law of trade secrets. *Abbott Laboratories v. Norse Chemical Corp.,* 33 Wis. 2d 445, 147 N.W.2d 529 (1967), adopted a six-factor test based on language from the Restatement of Torts.[3] These factors are: (1) the extent to which the information is known outside of the business of the party asserting trade secret status; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* at 463–64, 147 N.W.2d at 538–39. Each of the six factors should indicate that a trade secret exists if the information is to be afforded protection. *Corroon & Black-Rutters & Roberts, Inc. v. Hosch,* 109 Wis. 2d 290, 297, 325 N.W.2d 883, 887 (1982).

---

[3]Restatement of Torts § 757 comment b (1939).

Whether a trade secret exists is a mixed question of fact and law. *Id.* at 294, 325 N.W.2d at 885. Once the historical facts are found by the circuit court, whether those facts meet the legal standard is a question of law which we review without deference to the circuit court's decision. *Id.*

The circuit court found, as essentially undisputed material facts, that: (1) the information was completely confidential and not known outside Ziegler; (2) the information was generally made available only to Ziegler employees who had reason to use it; (3) Ziegler had a policy, which was communicated to its employees, including maintenance personnel, of keeping confidential all material containing customer information; (4) Ziegler took reasonable measures to guard the confidentiality of information about the identity of its customers; (5) the information has substantial value to Ziegler, Ehren and Ziegler's competitors; (6) Ziegler's customer list has been developed through its substantial efforts over the last seventy-five years; (7) the papers in the six boxes contain information about Ziegler's transactions with its customers and contain the names and addresses of persons who have purchased securities from Ziegler in the past and are active prospects for future sales; and (8) the information contained in the six boxes cannot be acquired from sources other than Ziegler. We agree that these findings are not significantly disputed.[4]

---

[4]Ehren contends that the fact that several deliveries of similar Ziegler materials were made to Lynn's belies its claim that it considered the information confidential and treated it as such. However, Ehren does not dispute that Ziegler had a formal policy regarding confidentiality that was communicated to its employees. Nor does he present any evidence that the delivery of the

Applying these findings to the *Abbott* factors, we conclude that the Ziegler customer information qualifies for trade secret status.

The present case is properly distinguishable from previous cases which have held customer lists and like information not to qualify as trade secrets. Ziegler's vice-president of administration gave testimony that customer account information is stored in locked cabinets in a locked room, accessible to one or two key employees. The computer department can be entered only by authorized persons, and the time and place of access by employees to areas containing customer information is monitored by means of an electronic system. As previously described, the firm also had a policy of confidentiality in disposing of its business paper.

These facts are markedly different from those regarding confidentiality in previous customer list cases. In *Corroon,* 109 Wis. 2d at 292, 325 N.W.2d at 885, customer files were kept in never-locked filing cabinets and expiration lists in rarely-locked cabinets

---

materials to Lynn's was due to anything other than accident or employee negligence. There is no contention that Ziegler knew that such materials were being disposed of in violation of its policy. Thus, we agree with the trial court that no dispute as to a material fact exists with regard to this issue.

Ehren also contends that "confidential" materials awaiting disposal at Ziegler sat in a particular corner of the "envelope room" which was rarely locked and was accessible to anyone in the Ziegler building. While perhaps better means of storage could have been devised, this procedure is not fatal to Ziegler's otherwise comprehensive policy of confidentiality, particularly since the accidental disclosure which occurred is not alleged to have been due to this procedure.

to which all employees had access. In *Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis. 2d 202, 207, 267 N.W.2d 242, 245 (1978), the customer list of a talent booking agency was compiled only for the purpose of assuring that Christmas cards were sent to all customers. Nothing in the record in that case showed any attempt to keep even the agency's marketing data secret. *Id.* at 212, 267 N.W.2d at 247. Customers for musical entertainment, i.e., clubs, could be located easily through telephone directories, calls to chambers of commerce and newspaper advertising. No special knowledge or expertise was required to gather such information and the information was of marginal value to anyone. *Id.*

Similarly, in *American Welding & Engineering Co. v. Luebke,* 37 Wis. 2d 697, 703, 155 N.W.2d 576, 578 (1968), and *Abbott,* 33 Wis. 2d at 465–66, 147 N.W.2d at 539–40, the records showed that the companies involved had not taken pains to treat the customer information as confidential and that it would not be difficult to independently compile the lists from other sources.

We also distinguish the present case from the previous customer list cases on the fifth *Abbott* factor. *See, e.g., Corroon,* 109 Wis. 2d at 297, 325 N.W.2d at 887. Here, the customer list was not merely a function of record keeping, a byproduct of the business, but was in a significant sense a vital asset of the business upon which efforts and money were expended in its own right. The list identifies persons who have invested in the securities Ziegler sells, who have sufficient money to make investments and who regularly invest in bonds as opposed to other investments. The development of such specialized information is very different from a list kept so that Christmas cards can be sent to

customers, as in *Gary Van Zeeland,* or even from the development of a list of insurance customers, as was involved in *Corroon.* The circuit court here found that there had been a concerted effort to develop the information over Ziegler's seventy-five years of doing business—that money and effort were expended by Ziegler in developing the information. We conclude that the fifth *Abbott* factor is met and therefore that all six *Abbott* factors are met. The Ziegler customer information thus qualifies for common-law trade secret protection.

Ehren next contends that even assuming trade secret status, this status does not survive an accidental or negligent disclosure. He cites *Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1063 (2d Cir.), *cert. denied,* 474 U.S. 844 (1985), and *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476 (1974) (citing Ohio case law).

The rule that accidental disclosure negates trade secret protection has not been expressly adopted in Wisconsin. The determination whether to protect information in a particular case depends upon the circumstances and the nature of the information involved. *See In re Innovative Constr. Sys., Inc.,* 793 F.2d 875, 880 (7th Cir. 1986).

Trade secrets law has developed largely in an effort to balance two competing interests—the interest of an employer in precluding others from exploiting specialized knowledge developed in the course of an employment relationship and the interest of the former employee in the general use of his or her skills and training ("know-how"). *Id.* at 879 (citing *Abbott,* 33 Wis. 2d at 453–54, 147 N.W.2d at 532–33). Our supreme court has narrowly drawn the scope of trade

secret protection "to effectuate the public policies of encouraging business competition and facilitating worker mobility." *Id.* (quoting *Wisconsin Elec. Power Co. v. Public Serv. Comm'n,* 110 Wis. 2d 530, 537, 329 N.W.2d 178, 182 (1983)).

In the present case, Ehren had no confidential or employment relationship with Ziegler. He purchased materials containing customer information for their scrap value and attempted to sell the information to a Ziegler competitor at an enormous profit. We are not persuaded that he may invoke the same policies which have led to the narrow scope of trade secret protection which applies as between an employer and a former employee. The circumstances are entirely different from those found in the employer-employee cases. No countervailing policy of worker mobility exists here to weigh against Ziegler's interest in the secrecy of extremely valuable and confidential information accidentally disposed of in readable form.[5]

Essentially, we conclude that, even assuming and conceding that Ehren acquired the Ziegler materials through no wrongdoing on his part, it would be inequitable to allow him to make use of the information contained therein. We hold that the trade secret

---

[5]It appears that the policy underlying the holdings in the cases cited by Ehren is that trade secret protection should not be afforded unless the information is genuinely secret. *See In re Innovative Constr. Sys., Inc.,* 793 F.2d 875, 883, 884 (7th Cir. 1986). In this case, the circuit court found as undisputed facts that Ziegler did treat its customer information as confidential and had mechanisms and policies designed to protect that confidentiality, and that the materials purchased by Ehren were discarded due to accident or the negligence of Ziegler employees.

status of the customer information survived its inadvertent disclosure in the present case.

The next issue is quickly disposed of. Ehren and Ziegler agree that Ehren's counterclaims for conspiracy, restraint of trade and tortious interference with business are dependent on Ehren's good title to the customer information. The circuit court ruled that Ehren did not acquire title to the information, though he did purchase the paper on which the information appeared. We agree with the circuit court's analysis following the reasoning in *West Coast Airlines, Inc. v. Miner's Aircraft & Engine Serv., Inc.,* 403 P.2d 833 (Wash. 1965).

In that case, West Coast meant to sell certain large cans to a scrap metal dealer. Unbeknownst to either party, valuable aircraft engines were sealed in two of the cans. Months later, when the scrap dealer opened the cans, Miner learned of the engines' presence there and eventually purchased them for $125 (scrap value). Miner then attempted to sell one of the engines for $1455. West Coast first learned the engines were missing when Miner contacted them trying to obtain FAA-required documents to accompany one of the engines.

The Washington supreme court distinguished the cans from their contents and held that title to the engines never passed from West Coast because there was no meeting of the minds as to the engines, no contract and thus no sale of the engines. Because no title passed to the scrap dealer, no title could pass to Miner. *Id.* at 837.

Here, Ziegler and Lynn's did not contemplate transferring customer information, only scrap paper. Lynn's did not purchase the materials for their

contents but for their scrap value. Following the *West Coast* analysis, Lynn's acquired title only to the paper, not to its unknown contents, and Ehren likewise could only acquire title to the paper. Since he lacks title to the customer information, his counterclaims were properly dismissed.[6]

In view of our conclusion that it would be inequitable for Ehren to use or dispose of the accidentally released customer information, we reject Ehren's contention that we should reverse the judgment based upon principles of equity. Ziegler's accidental release of the customer information does not rise to the level of "culpable carelessness." *Cf., e.g., State Bank of Drummond v. Christophersen,* 93 Wis. 2d 148, 160–61, 286 N.W.2d 547, 553 (1980). Nor do we accept Ehren's claim that Ziegler acted with unclean hands in requesting the assistance of the West Bend police in investigating what was originally suspected to be a leak from within the company. Ehren claims that Ziegler "privately utilized the resources of the West Bend Police Department to deceive Mr. Ehren." There is no evidence that such was Ziegler's purpose. The fact that when the police first contacted Ehren they told him Ziegler did not want the information returned[7] does not raise an inference that Ziegler (or the police) intended to deceive Ehren, only that Ziegler subsequently changed its position. Ehren has not

---

[6] Under this analysis, Ehren's good-faith state of mind in purchasing the materials, which he contends is a disputed issue of fact, is not material.

[7] Ziegler contended that when it gave the police this information, it thought only a few hundred customer names were involved, but that it took a much more serious view of the matter when it learned the true number involved.

asserted any form of estoppel. We perceive no genuine issue of fact regarding Ziegler's "unclean hands."

Since we conclude that no material issues of fact exist, we uphold the grant of summary judgment. Thus, we need not reach Ehren's final contention that on remand he would be entitled to a jury trial rather than a trial to the court.

*By the Court.*—Judgment affirmed.