**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**May 19, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP166**

STATE OF WISCONSIN

Cir. Ct. No. 2014CV212

**IN COURT OF APPEALS**
**DISTRICT III**

SANIMAX LLC,

PLAINTIFF-APPELLANT,

V.

BLUE HONEY BIO-FUELS, INC.,

DEFENDANT-RESPONDENT,

COULEE REGION BIO-FUELS, LLC,

DEFENDANT-RESPONDENT-THIRD-PARTY PLAINTIFF,

V.

JOHN HOLMES,

THIRD-PARTY DEFENDANT.

APPEAL from a judgment of the circuit court for Trempealeau County: ANNA L. BECKER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1    SEIDL, J. Sanimax LLC appeals a judgment awarding money damages and attorney's fees to Blue Honey Bio-Fuels, Inc., and Coulee Region Bio-Fuels, LLC.[1]   Sanimax contends the circuit court erred by: (1) failing to dismiss Blue Honey's defamation counterclaim on the ground that it failed to comply with the heightened pleading standard set forth in WIS. STAT. § 802.03(6) (2017-18[2]; and  (2) awarding Blue Honey attorney's fees under WIS. STAT. § 134.90(4)(c).  We conclude that Sanimax forfeited its first argument and that its second argument lacks merit.  Consequently, we affirm.

## BACKGROUND

¶2    Sanimax and Blue Honey are competitors in the business of collecting and processing used cooking oil.  More specifically, the companies compete for the right to purchase the "fryer oil" that is generated by food service companies during food frying operations.  After purchasing this oil, the companies refine it into biodiesel products.

¶3    Sanimax is a large corporation headquartered in Canada.  At the times relevant to this appeal, it commanded approximately a seventy percent share of the used cooking oil market in Wisconsin.  Blue Honey is, by comparison, a much smaller operator based in Trempealeau County.

---

[1] Blue Honey and Coulee Region Bio-Fuels are the same party in interest; Coulee Region does business as Blue Honey.  We refer to the two entities collectively as Blue Honey.

[2] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶4      Stephan Myers began working in the used cooking oil industry in 1979, at the age of fifteen.  His uncle, Wayne Sadek, formerly owned and operated Burbank Grease Services.[3]  In 2009, Myers began working for Sanimax as a sales representative.  Myers excelled in this role, exceeding his sales quota each quarter he held the position.

¶5      Despite his sales success, Myers grew dissatisfied with his employment at Sanimax in late 2013.  This dissatisfaction was tied to the hiring of Myers' new supervisor, William Molander, who cut Myers' performance-based bonuses and implemented other policies that negatively affected Myers' compensation.  Consequently, Myers—an at-will employee who was not subject to a noncompete agreement—decided to leave the company.

¶6      In May 2014, before anyone at Sanimax became aware that Myers intended to leave the company, Myers participated in a Sanimax "sales blitz."  A sales blitz, according to Sanimax dispatcher Traci Olrick, is a one-to two-week period during which the Sanimax sales team focuses its efforts on a specific geographic region in order to generate additional "sales."[4]

¶7      To facilitate the May 2014 sales blitz, Olrick prepared and emailed a spreadsheet to Myers and approximately fifteen to twenty other sales representatives.  This spreadsheet contained information for businesses in the blitz

---

[3] Sanimax is a successor in interest to Burbank Grease Services; Burbank was purchased by Anamax Group, which in turn was purchased by Sanimax.  According to Sanimax employee William Molander, Burbank "began" the used cooking oil industry in Wisconsin.

[4] We observe that on appeal, as in the circuit court, the parties refer to the acquisition of the right to purchase used cooking oil from a producer as a "sale," even though the collector (i.e., Blue Honey or Sanimax) actually purchases the oil from the producer.  We follow the parties' lead in this respect.

region, including current customers' names, account numbers, and pricing information. Although employees were instructed not to print the list due to its length, Myers requested that Olrick print a copy for him, and she did so.[5] It appears to be undisputed that Myers returned his copy of this list to a Sanimax employee after the sales blitz was completed.

¶8    Myers resigned his position with Sanimax on June 5, 2014. Eleven days later, he began working for Blue Honey. Shortly thereafter, Sanimax began receiving termination notices from customers in Myers' former sales territory. The notices were prepared using a standard template that Sanimax had never before received from departing customers and that appeared to contain Myers' handwriting.

¶9    Based on the foregoing, Sanimax surmised that Myers: (1) had decided to leave his position with Sanimax prior to the May 2014 sales blitz; (2) knew he would immediately begin working for Blue Honey; and (3) had obtained the sales blitz customer list so that he could utilize it in some fashion to persuade his former customers to switch their accounts to Blue Honey. Accordingly, Sanimax sued Blue Honey in October 2014, asserting claims of aiding and abetting a breach of duty of loyalty, unjust enrichment, misappropriation of trade secrets, theft of confidential information, and tortious interference with contract.

___

[5] We note that there was conflicting testimony at trial as to whether the list printed for Myers contained information for customers located solely within the sales blitz territory or whether it represented all of Myers' customer accounts. And, on appeal, the parties still dispute the exact contents of this printed list. For reasons explained more fully below, however, the precise scope of the customer list is not material to our decision because even assuming that Myers had taken a list as described by Sanimax, that list could not have constituted a trade secret under applicable law.

¶10    Blue Honey filed an answer and counterclaim. As relevant to this appeal, Blue Honey generally asserted in its counterclaim that Sanimax had engaged in "predatory and anticompetitive conduct and acts." Sanimax moved to dismiss Blue Honey's counterclaim "pursuant to WIS. STAT. § 802.06(2)[(a)]6[.] for failure to state a claim upon which relief can be granted." At a hearing, the circuit court determined that the "pleadings are lacking," but it granted Blue Honey leave to amend its counterclaim.

¶11    In its amended counterclaim, Blue Honey asserted that Sanimax made "threats" to Blue Honey's customers in Beaver Dam, Wisconsin.[6] Blue Honey also asserted that Sanimax's lawsuit was "an oppressive effort by Sanimax on grounds that it knows do not hold validity." In support of this assertion, Blue Honey stated that

> the essence of the current controversy is a claim that Stephan Myers took a customer list and later made contact with [Sanimax]'s customers in aid of the business of [Blue Honey]. That does not state a legal claim [based upon] *Burbank Grease Services, LLC v. Sokolowski*, 2006 WI 103, 294 Wis. 2d 274, 717 N.W.2d 781.

¶12    Sanimax moved to dismiss the amended counterclaim. As before, Sanimax brought its motion "pursuant to WIS. STAT. § 802.06(2)[(a)]6[.] for failure to state a claim upon which relief can be granted." The circuit court denied this motion after determining that the amended counterclaim met "the minimum standards for what their allegations are." The court then issued a scheduling order.

---

[6] Although the amended counterclaim did not explicitly refer to these threats as defamatory, the parties agree on appeal that this allegation served as the basis for a defamation claim that was later submitted to the jury.

¶13 Blue Honey learned in discovery that, in the wake of Myers' departure from Sanimax, a Sanimax sales manager had instructed Sanimax sales representatives to inform clients that Myers was dishonest and had stolen Sanimax's book of business. At least one Sanimax sales representative, John Holmes, stated that he followed these instructions for several months in late 2014.

¶14 The matter proceeded to a five-day jury trial in August 2018. The jury ultimately rejected all of Sanimax's claims against Blue Honey. In doing so, the jury specifically found that Myers did not "intentionally take" Sanimax's customer list and that, in any event, the list did not constitute a trade secret.[7]

¶15 On Blue Honey's counterclaims, the jury found that Sanimax had engaged in restraint of trade and tortious interference of contract, but it awarded no damages on either claim. The jury also found that Sanimax, through its employees, had defamed Blue Honey and awarded $100,000 in damages.

¶16 Blue Honey filed a postverdict motion seeking, in relevant part, an award of attorney's fees under WIS. STAT. § 134.90(4)(c).[8] At a hearing on Blue Honey's motion, the circuit court found that Sanimax's claim for misappropriation of trade secrets was maintained objectively and subjectively in bad faith. The court therefore awarded Blue Honey $50,102.09 in attorney's fees

---

[7] The jury was not also asked to determine whether Myers unintentionally took Sanimax's customer list.

[8] WISCONSIN STAT. § 134.90(4)(c) provides that if a party makes a claim of misappropriation of trade secrets "in bad faith … the court may award reasonable attorney fees to the prevailing party."

6

under § 134.90(4)(c) and entered judgment on the jury's verdict.  Sanimax now appeals.

## DISCUSSION

### I. WISCONSIN STAT. § 802.03(6)

¶17    On appeal, Sanimax first argues that the circuit court erred by failing to dismiss Blue Honey's defamation counterclaim.  Sanimax reasons that Blue Honey's counterclaim failed to set forth the "particular words" alleged to have been defamatory, and the counterclaim therefore failed to meet the statutory requirement for defamation claims set forth in WIS. STAT. § 802.03(6).  *See Ashker v. Aurora Med. Grp., Inc.*, 2013 WI App 143, ¶11, 352 Wis. 2d 193, 841 N.W.2d 297.

¶18    Blue Honey responds that Sanimax forfeited any argument related to WIS. STAT. § 802.03(6) by failing to raise that statute before the circuit court.[9]  We agree with Blue Honey.

¶19    As a general rule, we do not consider arguments raised for the first time on appeal.  *See Townsend v. Massey*, 2011 WI App 160, ¶¶23-27, 338

---

[9] We note that Blue Honey argues noncompliance with WIS. STAT. § 802.03(6) is an affirmative defense, and that we should therefore deem Sanimax to have waived its § 802.03(6) argument by failing to raise it in a responsive pleading.  *See Maple Grove Country Club Inc. v. Maple Grove Estates Sanitary Dist.*, 2019 WI 43, ¶3, 386 Wis. 2d 425, 926 N.W.2d 184.  We need not, and do not, decide whether noncompliance with § 802.03(6) constitutes an affirmative defense, because our conclusion that Sanimax forfeited its § 802.03(6) argument is not based upon when or in what form Sanimax raised its argument before the circuit court; rather, it is based upon the fact that Sanimax failed to raise its argument at all.  *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (court of appeals decides cases on the narrowest possible grounds).

Wis. 2d 114, 808 N.W.2d 155. One rationale for this rule is that it prevents disruption of the judicial process by allowing the circuit court the opportunity to address any objections in the first instance. *Id.*, ¶26. Requiring a party to raise all arguments in the circuit court also gives the opposing party notice and an opportunity to address the objection. *Id.* Further, the rule functions to prevent appellate courts from blindsiding circuit courts with reversals based on legal theories which did not originate in their forum. *Id.*, ¶25. To that end, the "rule focuses on whether particular arguments have been preserved, not on whether general issues were raised before the circuit court." *Id.*

¶20 Sanimax acknowledges in it reply brief that it never raised a WIS. STAT. § 802.03(6) argument before the circuit court. Nonetheless, it argues that we should consider its argument under this statute for the first time on appeal because it "unsuccessful[y] object[ed] to the vagueness of Blue Honey's counterclaim as a whole" under WIS. STAT. § 802.06(2) and thus "never waived or abandoned its objection to Blue Honey's defamation claims."

¶21 The problem with Sanimax's argument is that it would undermine the purposes of the forfeiture rule set forth above. To explain, if we now considered Sanimax's argument that Blue Honey's counterclaim should have been dismissed pursuant to WIS. STAT. § 802.03(6), we would potentially blindside the circuit court with a reversal after nearly four years of litigation up to and including a jury trial, based upon an entirely new theory as to why Blue Honey's counterclaim was deficient at the pleading stage. Far from promoting judicial efficiency or fairness in litigation, such a result would encourage parties to develop new arguments on appeal—regardless of how much time, money, and judicial resources could have been conserved had the argument been timely raised below.

¶22 Our conclusion that application of the forfeiture rule is warranted here is further supported by the fact that Sanimax did not object to the evidence Blue Honey introduced to support its defamation counterclaim, under any legal theory, after the circuit court denied its motion to dismiss. In other words, Sanimax allowed the jury to be presented evidence on Blue Honey's defamation counterclaim and to return a verdict on the same, without alerting the court or Blue Honey that it thought such action was improper. Moreover—despite Sanimax's assertion on appeal that Blue Honey waited until the "eleventh hour" to fill in the particulars of its counterclaim—Sanimax itself submitted a proposed special verdict form that addressed the allegedly defamatory statements Blue Honey uncovered in discovery and asked the jury to determine if they were, in fact, "defamatory." Thus, Sanimax, at the least, implicitly consented to the propriety of litigating Blue Honey's defamation counterclaim. *See* WIS. STAT. § 802.09(2) ("If issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). For all these reasons, we deem Sanimax's WIS. STAT. § 802.03(6) argument forfeited.

## II. WISCONSIN STAT. § 134.90(4)(c)

¶23 Sanimax next argues that the circuit court erred by awarding Blue Honey attorney's fees under WIS. STAT. § 134.90(4)(c). The parties appear to agree that no published Wisconsin case has addressed an award of attorney's fees under this statute. Given that § 134.90(4)(c) is a part of the Uniform Trade Secrets Act (UTSA), however, they also appear to agree that our interpretation of what constitutes the "bad faith" necessary to justify an award of attorney's fees under

§ 134.90(4)(c) is guided by the decisions of appellate courts in other jurisdictions that have adopted the UTSA. *See* WIS. STAT. § 134.90(7)[10]; ***Burbank Grease***, 294 Wis. 2d 274, ¶26 (recognizing that Wisconsin courts generally interpret and apply provisions in § 134.90 "in accord with other UTSA jurisdictions").

¶24 The parties further agree on appeal—as they did in the circuit court—on the two-prong test that the majority of jurisdictions have applied to determine whether a misappropriation of trade secrets claim has been made in bad faith. Specifically, they agree that the fee-seeking party must demonstrate that: (1) the trade secrets claim was objectively specious; and (2) there was subjective bad faith (i.e., an improper purpose) in bringing or maintaining the claim. *See **SASCO v. Rosendin Elec., Inc.***, 143 Cal. Rptr. 3d 828, 834 (Cal. Ct. App. 2012).

¶25 Thus, we are presented with a mixed question of law and fact—that is, whether Sanimax's trade secrets claim was objectively specious under applicable law and whether the circuit court properly found that Sanimax brought its claim for an improper purpose. We apply a clearly erroneous standard to the latter question, while we independently review the former.[11] *See **Wassenaar v. Panos***, 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983); *see also **Elmakias v. Wayda***, 228 Wis. 2d 312, 319, 596 N.W.2d 869 (Ct. App. 1999).

---

[10] WISCONSIN STAT. § 134.90(7) provides that § 134.90 "shall be applied and construed to make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws."

[11] We observe that WIS. STAT. § 134.90(4)(c) does not mandate an award of attorney's fees if the circuit court determines that a misappropriation of trade secrets claim has been made in bad faith; rather, the statute provides that a court "may award" fees in such a situation. Because Sanimax argues only that the court erred in determining that Sanimax pursued its claim in bad faith, we do not further address this issue.

¶26    We begin by considering whether Sanimax's misappropriation of trade secrets claim was objectively specious, as a matter of law.  We conclude that it was, based upon our decision in ***Burbank Grease Services, LLC v. Sokolowski***, 2005 WI App 28, ¶¶19-23, 278 Wis. 2d 698, 693 N.W.2d 89, *aff'd in part, rev'd in part on other grounds*, 2006 WI 103, 294 Wis. 2d 274, 717 N.W.2d 781.[12]

¶27    It is axiomatic that to successfully pursue a misappropriation of trade secrets claim, a plaintiff must show that the information allegedly misappropriated by a defendant was, in fact, a trade secret.  Here, the information that Sanimax alleged Myers misappropriated was a customer list—a type of information which may, under certain circumstances, constitute a trade secret within the meaning of WIS. STAT. § 134.90(1)(c).  *See **Minuteman, Inc. v. Alexander***, 147 Wis. 2d 842, 857, 434 N.W.2d 773 (1989).  Critically, however, we held in ***Burbank Grease*** that in the "grease collection industry,"[13] customer lists indistinguishable from the one at issue here (i.e., lists containing customers' names, addresses, contact persons, along with a collector's internal pricing information) did not constitute a trade secret.  *See **Burbank Grease***, 278 Wis. 2d 698, ¶¶19-23.

¶28    Sanimax attempts to distinguish the present case from ***Burbank Grease*** on three grounds, none of which persuade us.  First, it argues that the former employee in ***Burbank Grease*** "did not abscond with pricing information

---

[12]    In ***Burbank Grease***, the parties disputed before this court whether the customer lists at issue constituted trade secrets.  ***Burbank Grease Servs., LLC v. Sokolowski***, 2005 WI App 28, ¶1, 278 Wis. 2d 698, 693 N.W.2d 89.  We determined that they did not.  *See **id.***, ¶¶19-23.  That aspect of our decision was not appealed and was therefore not addressed by our supreme court on review.  *See **Burbank Grease Servs., LLC v. Sokolowski***, 2006 WI 103, ¶16, 294 Wis. 2d 274, 717 N.W.2d 781.

[13]    According to Molander's trial testimony, used cooking oil is referred to as "yellow grease or yellow oil in the industry."

11

for chain restaurants or industrial clients while Myers' list had detailed information on both of those customer groups."

¶29    That argument rests on a mischaracterization of the lists at issue in *Burbank Grease*.  Sanimax is correct that one of the hard-copy lists at issue in that case did not contain pricing information on "chain restaurants and large industrial customers."  *See **Burbank Grease***, 278 Wis. 2d 698, ¶5.  Still, a separate spreadsheet did contain pricing information on industrial clients, and another spreadsheet showed "the amount of collections and revenues per customer."  ***Id.*** Moreover, Sanimax fails to adequately explain why the distinction it attempts to draw between the lists at issue in *Burbank Grease* and the list in this case renders *Burbank Grease*'s holding inapplicable here.  *See id.*, ¶¶22-23.  We need not, and do not, address this undeveloped argument.  ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

¶30    Second, Sanimax argues that

> [a]lthough Sanimax starts most of its pricing using the market-rate baseline set by the Jacobsen yellow grease market in Chicago, Sanimax employs a number of pricing tiers tailored to different categories of [used cooking oil] producers.  "Tier 1" customers—largely chain restaurants and institutional customers—produce higher volumes of [used cooking oil] and receive comparatively higher pay than "Tier 3" customers, which are largely comprised of "mom and pop" shops that produce lower volumes of [used cooking oil] and receive less pay for their production.

Sanimax therefore argues its pricing is nonstandard and "not solely based on the market."

¶31    We fail to perceive how this argument distinguishes this case from *Burbank Grease*, wherein we referred to the undisputed fact that it was standard

12

practice in the grease collection industry to place customers into different "price groups." *Burbank Grease*, 278 Wis. 2d 698, ¶19. Stated differently, we perceive no meaningful distinction between calling a pricing level a "tier" or a "group."

¶32 Third, Sanimax argues that it "cannot and should not be held to the sins of its predecessors" (i.e., Burbank Grease). Although we agree with this sentiment in the abstract, Sanimax's argument is misplaced. Our conclusion that Sanimax's misappropriation of trade secrets claim was objectively specious does not concern the actions of Sanimax's predecessor; instead, it concerns Sanimax's failure to recognize the fact that we have previously held customer lists in *Burbank Grease*—indistinguishable from the one at issue in this case—did not constitute a trade secret.[14]

¶33 Turning to the circuit court's factual finding that Sanimax pursued its misappropriation of trade secrets claim with subjective bad faith, we conclude that finding was not clearly erroneous. The court provided the following explanation for its decision:

> [A]fter hearing the whole trial … when you look at [the case] in light of the fact that *Burbank [Grease]* had been decided in 2005; [counsel for Blue Honey] brought [that case] up and put [Sanimax] on notice…. All we have is a company that's pretty ticked off at somebody who was a very good employee at one time leaving and hurting their share in the market, and I think it was basically retribution; and they were ticked, and they figured maybe they could drive the little guy out of business because [Blue Honey wasn't] going to be able to defend against the claim because it's very difficult to do all those discoveries, as you

---

[14] Indeed, Sanimax did not even mention our decision in *Burbank Grease* in its brief-in-chief. Instead, and despite the fact that the circuit court explicitly cited that case as the only Wisconsin case "directly on point" at the hearing on Blue Honey's motion for attorney's fees under WIS. STAT. § 134.90(4)(c), Sanimax waited until its reply brief to discuss the case.

know, to go through all the litigation. It becomes very costly just to try those issues. …

[M]ere supposition that [Myers] maybe took a list is not sufficient under the case law or the statutes because, number one, I don't believe that [the customer list] was a trade secret, and, number two, there was no indication that [Myers] actually did anything of the sort. There was not one piece of information other than they assumed that maybe he did.

¶34    The record on appeal provides ample support for the circuit court's finding that Sanimax's purpose in pursing its bad faith claim "was basically retribution."   As indicated, Blue Honey put Sanimax on notice as early as September 2015 that, under **Burbank Grease**, the facts alleged by Sanimax did not state a viable misappropriation of trade secrets claim.   Nonetheless, Sanimax continued to pursue its claim through trial, despite the fact that Sanimax undisputedly never produced any proof that Myers had, in fact, taken any list when he left Sanimax for Blue Honey.

¶35    Further, the record shows that Myers was a top salesperson for Sanimax, the company that commanded the lion's share of the used cooking oil market in Wisconsin.   Then, after he left Sanimax to a work for its much smaller competitor, he was successful enough at persuading previous customers to switch their accounts that Sanimax management directed its sales representatives to impugn his character to former clients.   These facts, taken together, support the court's inference that Sanimax's subjective intent in pursuing its claim was not to actually succeed on its merits; but rather to use its lawsuit to exact retribution on Myers and to cause his new, smaller employer financial pain.

¶36    On appeal, Sanimax acknowledges that it never produced any "direct evidence" that Myers had taken a customer list.   Still, it argues that "the

circumstances of Myers' actions leading up to his resignation and the immediate impact upon his beginning with Blue Honey supported the inference that [Myers] had taken the list and used it to his advantage with Blue Honey." Consequently, Sanimax reasons it was justified in pursuing its claim.

¶37 We are not persuaded by Sanimax's argument for two reasons. First, even if Sanimax's initial suppositions about the circumstances surrounding Myers' departure from its employ supported a reasonable inference that Myers had taken a customer list, none of the discovery in this well-litigated case uncovered facts corroborating that inference. Thus, Sanimax's decision to continue to maintain the trade secrets claim, despite this lack of evidence, supports the circuit court's finding of subjective intent.

¶38 Second, merely citing to circumstances which could have supported an alternative inference regarding Sanimax's subjective intent does not show that the circuit court's finding in this regard was clearly erroneous. "When evidence supports the drawing of either of two conflicting but reasonable inferences, the trial court, and not this court, must decide which inference to draw." *Plesko v. Figgie Int'l*, 190 Wis. 2d 764, 776, 528 N.W.2d 446 (Ct. App. 1994). In all, we conclude the circuit court did not err in awarding attorney's fees to Blue Honey under WIS. STAT. § 134.90(4)(c).[15]

---

[15] In a single paragraph at the conclusion of its response brief, Blue Honey asserts, without providing citation to any legal authority, that "attorneys fees ought to be allowed for defending this issue on appeal." We decline to consider this undeveloped and unsupported argument. *State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.